UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| TECHNOLOGY LICENSING CORPORATION, | ) | |
| | ) | |
| Plaintiff, | ) | 12 C 1444 |
| | ) | |
| vs. | ) | Judge Feinerman |
| | ) | |
| JVC AMERICAS CORPORATION, | ) | |
| | ) | |
| Defendant. | ) | |

**MEMORANDUM OPINION AND ORDER**

Plaintiff Technology Licensing Corporation ("TLC") alleges in this lawsuit that Defendant JVC Americas Corporation infringed six TLC patents in violation of federal patent law, 35 U.S.C. § 1 *et seq*. JVC Americas has moved for summary judgment. The facts set forth below are stated as favorably to TLC as the record and Local Rule 56.1 allow. JVC Americas's motion is granted in part and denied in part.

The basis for JVC Americas's motion is not patent law. Instead, JVC Americas argues that a contract called the Patent License and Settlement Agreement ("Agreement") grants it a license to practice four of the patents asserted by TLC and protects it from suit with a non-assertion covenant as to the other two. Doc. 34. The Agreement ended an earlier lawsuit, *IP Innovation LLC v. Panasonic Corp. of North America*, No. 05 C 902 (N.D. Ill. filed Feb. 14, 2005), that TLC and others had filed against Matsushita Electric Industrial Company Ltd. ("Matsushita") and others. Doc. 42-1.

A license "is a defense to patent infringement." *Carborundum Co. v. Molten Metal Equip. Innovations, Inc.*, 72 F.3d 872, 878 (Fed. Cir. 1995). "A license agreement is a contract

-1-

governed by ordinary principles of state contract law." *Power Lift, Inc. v. Weatherford Nipple-Up Sys., Inc.*, 871 F.2d 1082, 1085 (Fed. Cir. 1989); *see also McCoy v. Mitsuboshi Cutlery*, 67 F.3d 917, 920 (Fed. Cir. 1995) (same). The Agreement's choice-of-law provision states that it should be interpreted pursuant to New York law, Doc. 42-1 at ¶ 7.9, so that is the law the court will apply. *See Auto-Owners Ins. Co. v. Websolv Computing, Inc.*, 580 F.3d 543, 547 (7th Cir. 2009). The governing New York contract principles are as follows:

> Under New York law, [c]onstruction of an unambiguous contract is a matter of law, and the intention of the parties may be gathered from the four corners of the instrument and should be enforced according to its terms. New York courts construe contracts so as to give full meaning and effect to the material provisions, mindful that a proper reading of the contract should not render any portion meaningless. Further, a contract should be read as a whole, and every part will be interpreted with reference to the whole; and if possible it will be so interpreted as to give effect to its general purpose.

*Imation Corp. v. Koninklijke Philips Elecs. N.V.*, 586 F.3d 980, 985 (Fed. Cir. 2009) (citations and internal quotation marks omitted).

The Agreement refers to two sets of patents, the "Asserted Patents" and the "Other Patents." Doc. 42-1 at ¶¶ 1.4, 1.5. Four of the six patents that TLC asserts in this suit, U.S. Patent Nos. 6,141,057, 5,946,049, 5,550,594, and 6,469,741, which the parties call the "VFS Patents," are among the Asserted Patents. Doc. 57 at ¶ 9. The other two patents asserted by TLC, U.S. Patent Nos. RE 40,411 and RE 40,412, which the parties call the "Reissue Patents," are among the Other Patents. *Id*. at ¶ 12. In ¶ 2.1 of Agreement, TLC granted "Panasonic" a license to practice the Asserted Patents, and in ¶ 2.3, TLC covenanted not to assert the Other Patents against "Panasonic." Doc. 42-1 at ¶¶ 2.1, 2.3. Because the distinction between a license and a non-assertion covenant is irrelevant to this suit, the Asserted Patents and the Other Patents will be treated together, with one exception noted near the end of this opinion. *See Spindelfabrik*

*Suessen-Schurr Stahlecker & Grill GmbH v. Schubert & Salzer Maschinenfabrik Aktiengesellschaft*, 829 F.2d 1075, 1081 (Fed. Cir. 1987) ("a patent license agreement is in essence nothing more than a promise by the licensor not to sue the licensee").

Paragraph 1.2 of the Agreement defines "Panasonic"—the entity to which the Agreement granted the license and non-assertion covenant—to "mean Matsushita … and its Subsidiaries." Doc. 42-1 at ¶ 1.2. Paragraph 1.1 defines "subsidiary" as follows:

> "Subsidiary(ies)" shall mean and collectively include any corporation … or other entity … in which a Party [to the Agreement] … now or hereafter, directly and/or indirectly, owns or controls: a. in the case of corporate entities, fifty percent (50%) or greater … of the stock or participating shares entitled to vote for the election of directors.

*Id*. at ¶ 1.1. It is beyond genuine dispute that JVC Americas was a "subsidiary" of Matsushita when the Agreement was executed in December 2005. At that time, JVC Americas was a wholly owned subsidiary of Victor Company of Japan, Limited ("JVC Japan"), and Matsushita directly controlled more than 50% of JVC Japan. Doc. 57 at ¶¶ 18-21.[*] Thus, Matsushita indirectly held a majority stake in JVC Americas, which means that JVC Americas was a "subsidiary" within the meaning of the Agreement. *Id*. at ¶ 21. Because the Agreement grants to "subsidiaries" the

---

[*] TLC quibbles with the submission in JVC Americas's Local Rule 56.1(a)(3) statement that JVC Americas was wholly owned by JVC Japan in 2005. Doc. 36 at ¶¶ 20-21. TLC's only quibble is that the record materials cited by JVC Americas are in Japanese and that the English translations of those materials had not been properly authenticated. Doc. 57 at ¶ 20 (the materials "are in a foreign language, and the translations are inadmissible hearsay"), ¶ 21 ("Admitted if the translations are correctly authenticated."). In response, JVC Americas submitted indisputably proper authentications. Docs. 61-1 through 61-4. Because TLC does not suggest that it actually doubts as a factual matter that JVC Japan wholly owned JVC Americas at the time the Agreement was executed, because TLC conditioned its admission of the key point—that because Matsushita "indirectly controlled JVC Americas, JVC Americas was a Licensee under the 2005 Agreement"—on the "translations [being] properly authenticated," Doc. 57 at ¶ 21, and because JVC Americas submitted proper authentications, there is no genuine factual dispute over these matters.

same rights and protections granted to Matsushita itself, it follows that JVC Americas was covered by the Agreement's license and non-assertion covenant.

The dispositive question here is whether JVC Americas lost its rights under the Agreement when, in mid-2007, about two years after the Agreement was executed, Matsushita ceased to control a majority of JVC Americas's stock. Doc. 57 at ¶¶ 31, 33, 41-46 (describing the relevant corporate transactions). The answer is that JVC Americas remained and continues to remain a beneficiary of the Agreement. As noted above, the Agreement grants the license and non-assertion covenant to "Panasonic" and defines "Panasonic" to mean "Matsushita … and its Subsidiaries." JVC Americas was a "subsidiary" when the Agreement was executed, and nothing in the Agreement suggests that a "subsidiary" could lose its rights under the Agreement upon ceasing to be majority owned by Matsushita. Indeed, the Agreement says that the license is "irrevocable" and that the non-assertion covenant is made "irrevocably and perpetually." Doc. 42-1 at ¶¶ 2.1, 2.3. It follows that JVC Americas retained its rights and protections under the Agreement even after it ceased being majority owned by Matsushita in mid-2007. *See Nano-Proprietary, Inc. v. Canon, Inc.*, 537 F.3d 394, 400 (5th Cir. 2008) (holding under New York law that where party had been granted an "irrevocable" and "perpetual" license, the license could not be terminated even upon the party's breach of the licensee).

In arguing to the contrary, TLC principally relies on the Agreement's use of the term "now" in its definition of "subsidiary"; recall that "subsidiary" is defined as firms "now or hereafter" under Matsushita's majority ownership or control. Doc. 42-1 at ¶ 1.1. TLC takes the term "now" to indicate that such firms remain covered by the Agreement only so long as Matsushita retains a majority stake in them. According to TLC, because JVC Americas is not

"now" (in 2012, when this suit was filed, in 2013, the present calendar year, or whenever after mid-2007 JVC Americas allegedly infringed TLC's patents) controlled by Matsushita, it is not "now" covered by the Agreement. That understanding of the Agreement is implausible. The only reasonable meaning of "now" is "at the time this Agreement is executed," meaning in December 2005. It is impossible to credit the proposition, on which TLC's argument rests, that the term "now" in a contract executed in December 2005 means not the day of execution in December 2005, but any given day in the future on which the Agreement is invoked.

TLC contends that other provisions show that the Agreement ceases to apply to "subsidiaries" in which Matsushita ceases to hold a majority stake. Paragraph 2.1 says that the license to practice the Asserted Patents is "non-transferable (except as otherwise provided in this Agreement)." Doc. 42-1 at ¶ 2.1. Paragraph 7.4 describes how the license may be transferred:

> If Panasonic transfers a substantial portion of its business to which the Asserted Patents or Other Patents relate, Panasonic may assign its rights, but not less than the entirety of the Asserted Patents and Other Patents under this Agreement to the successor transferred businesses only upon written notice to and written approval by [TLC], which approval will not be unreasonably withheld. If Panasonic assigns its rights under this Agreement to an acquiring company, the assignment will not protect past and present products made by such acquiring company at the time of the acquisition or any future products that are a continuation of products that were previously made or sold by the acquiring party.

Doc. 42-1 at ¶ 7.4. According to TLC, ¶ 7.4 allows Matsushita to request and TLC to approve continued coverage under the Agreement for firms over which Matsushita loses majority control, and thus shows that the parties did not intend for "subsidiaries" to automatically retain coverage under the Agreement after Matsushita ceases to control them.

TLC's reading of ¶ 7.4 is incorrect. That provision does not pertain to circumstances where Matsushita loses majority control over a firm that was a "subsidiary" when the Agreement

was executed. As noted above, "Panasonic" means "Matsushita … and its Subsidiaries." *Id*. at ¶ 1.2. Because JVC Americas meets the definition of "subsidiary," the term "Panasonic" in ¶ 7.4 includes JVC Americas. The term "successor" in the passage "Panasonic may assign its rights … under this Agreement to the successor transferred businesses" therefore cannot possibly apply to firms that were "subsidiaries" when the Agreement was executed; such firms possessed rights under the Agreement from its inception and thus do not need those rights to be transferred to them. JVC Americas was itself granted a license and a non-assertion covenant by the Agreement; changes to JVC Americas's ownership do not negate that grant. It follows that ¶ 7.4 refers not to Matsushita's loss of control over a firm that was a "subsidiary" when the Agreement was executed, but instead to another sort of event, such as the sale of an unincorporated division; for instance, if Matsushita sold a division to another firm, Matsushita could attempt to transfer the license and covenant along with the division by seeking TLC's approval under ¶ 7.4.

TLC makes much of a letter that Matsushita sent to TLC in July 2007, when the transactions that resulted in Matsushita losing majority control of JVC Americas were about to take place. Doc. 35-4. TLC argues that the letter shows that Matsushita shared JVC's view of the Agreement—the view that firms that were "subsidiaries" when the Agreement was executed lose their rights under the Agreement when they cease being majority owned by Matsushita, unless TLC's approves continued coverage. The letter is legally irrelevant. Under New York law, "matters extrinsic to the agreement may not be considered when the intent of the parties can fairly be gleaned from the face of the instrument." *Terwilliger v. Terwilliger*, 206 F.3d 240, 245 (2d Cir. 2000); *see also Klos v. Lotnicze*, 133 F.3d 164, 168 (2d Cir. 1997) (same). This is so even if the extrinsic evidence consists of formal correspondence sent by the counter-party of the

proponent of that evidence. *See LaSalle Bank Nat'l Ass'n v. Nomura Asset Capital Corp.*, 424 F.3d 195, 207 (2d Cir. 2005) ("Because we do not think the [contract] is reasonably capable of more than one meaning, we conclude that the district court ought not to have required that LaSalle produce evidence that eighty percent warranties are the 'custom or practice in the mortgage industry,' and that the court should not have relied on other extrinsic evidence of the parties' intent, such as their 'course of dealing.'") (citations and internal quotation marks omitted) (citing New York cases); *Gen. Auth. For Supply Commodities, Cairo, Egypt v. Ins. Co. of N. Am.*, 951 F. Supp. 1097, 1111 (S.D.N.Y. 1997) ("The January 1981 Letter … is precisely the type of extrinsic document the review of which is beyond this Court's scope of examination under relevant New York contract law."); *Bast Hatfield, Inc. v. Gen. Elec. Co. ex rel. Knolls Atomic Power Lab.*, 229 A.D.2d 892, 894 (N.Y. App. 1996) ("To the extent that plaintiffs seek to create an ambiguity by reference to the October 16, 1991 letter, it is clear that extrinsic evidence cannot be used to create an ambiguity in what is otherwise an unambiguous contract."); *Murray Walter, Inc. v. Sarkisian Bros., Inc.*, 183 A.D.2d 140, 146 (N.Y. App. 1992) ("the letter was not admissible extrinsic evidence of the parties' mutual intent in entering into their agreement, but merely a unilateral expression of one party's postcontractual subjective understanding of the terms of the agreement and, therefore, was not probative as an aid to the interpretation of the contract"). Because the parties' intent regarding JVC Americas's continued coverage under the Agreement is plain on the Agreement's face, from its unambiguous text, extrinsic evidence like the July 2007 letter cannot be invoked in an attempt to alter the Agreement's plain meaning.

It bears mention, if only for the sake of completeness, that Matsushita's July 2007 letter does not, in fact, suggest that Matsushita shared what TLC claims was TLC's understanding of

the Agreement. The letter begins by explaining that Matsushita would soon cease to have majority control of JVC Japan, which as noted above wholly owned JVC Americas. Doc. 35-4 at 2. The letter then states:

> Meanwhile, we have entered into "PATENT LICENSE AND SETTLEMENT AGREEMENT" with [TLC] as of December 2, 2005 … which also covers the license to JVC [Japan] as a Subsidiary defined in section 1.1 in the Agreement. As we will be entirely licensed and released by paying 1,500,000 US dollars on or before December 31, 2007 and 2,000,000 US dollars on or before December 31, 2008 *as the remaining installments* of the entire royalty payment to [TLC], we are sure that JVC [Japan] will enjoy the whole rights licensed under the Agreement pursuant to the terms and conditions under the Agreement even after the above transaction subject to the above payments to be made by [Matsushita].

*Id*. at 2-3 (italics added). In an August 2007 letter drafted by a private lawyer who represented TLC in the *IP Innovation* suit and who now represents TLC in this suit, TLC responded that it accepted "that proposal and agree[d] to the extension of those rights granted under the December 2005 Agreement to JVC [Japan], as well as [Matsushita], even after the … transaction, so long as the agreed two payments totall[ing] $3,500,000 are made by [Matsushita]." Doc. 35-5 at 3.

When it mentioned "the remaining installments" of $1.5 million and $2 million, Matsushita's letter indisputably was referring to the presumptive payment schedule in ¶ 3.1 of the Agreement, which required Matsushita to pay $5 million to TLC, with the first $1.5 million due by the end of 2006 (and thus prior to the Matsushita letter's being drafted and sent), the next $1.5 million by December 31, 2007, and the final $2 million by December 31, 2008. Doc. 42-1 at ¶ 3.1. The letter did not refer to the alternative payment schedule in ¶ 3.1, which provided that "the payment can be accelerated and thus reduced to three million, seven hundred and fifty thousand U.S. dollars (US$3,750,000)" if paid by January 2006. *Ibid*. That was an error, as Matsushita had paid pursuant to the accelerated schedule and therefore had satisfied its payment

obligation under the Agreement prior to sending its letter. Doc. 57 at ¶ 35. When TLC's August 2007 response construed Matsushita's reference to "the remaining installments" as an offer by Matsushita to make entirely new payments to permit extending the license to JVC Japan, Matsushita recognized its error. It sent TLC a letter in August 2007 explaining that its July 2007 letter "contained an error in that it mechanically referred to the payment schedule in the Agreement, without recognizing that this Agreement was fully paid since [Matsushita] made the two accelerated payments provided for in Par. 3.1"; attached to the second letter were records showing that the accelerated payments had indeed been made. Doc. 35-6 at 2-10. TLC never responded to Matsushita's clarification. Doc. 57 at ¶ 40.

What happened here is clear. Matsushita's July 2007 letter plainly referred to Matsushita's own payments under the Agreement, and expressed Matsushita's belief that the Agreement would continue to cover JVC Japan (and thus JVC Americas) even after Matsushita lost its majority stake. The letter cannot plausibly be construed to suggest that Matsushita believed that JVC Americas would retain its rights under the Agreement only if Matsushita paid $3.5 million more than the amounts called for by ¶ 3.1; the term "installment payments" in the letter referred to the payments under the Agreement's presumptive payment schedule, not to payments above and beyond what ¶ 3.1 required Matsushita to pay. Indeed, the July 2007 letter conveyed Matsushita's belief that no payment other than those required by ¶ 3.1 was necessary to ensure that JVC Americas would retain coverage under the Agreement: "we are sure that JVC will enjoy the whole rights licensed under the Agreement pursuant to the terms and conditions under the Agreement even after the above transaction." Doc. 35-4 at 2-3. Still, as noted above, all this is beside the point. The understanding of the Agreement expressed in a letter sent over

eighteen months after the Agreement's execution in December 2005 is extrinsic evidence, and thus is legally irrelevant because the Agreement, when considered against the undisputed facts, unambiguously provides that JVC Americas was and remains covered by the Agreement.

TLC also argues that the suit can go forward because the Agreement's license and covenant apply only to "Products," and ¶ 1.6 defines "Products" to mean "any and all current, past or future products, systems or services *bearing a brand name owned by Panasonic, or made by or for Panasonic*." Doc. 42-1 at ¶ 1.6 (emphasis added). Relying on the emphasized text, TLC argues that the accused JVC Americas products were not made by or for Panasonic and do not bear any Panasonic brand, and from that premise concludes that the Agreement does not protect the accused products. But recall yet again that the Agreement defines "Panasonic" to mean "Matsushita … and its Subsidiaries." *Id*. at ¶ 1.2. Because JVC Americas meets the definition of "subsidiary," the term "Panasonic" in ¶ 1.6 includes JVC Americas. TLC does not dispute that the accused products bear a brand name owned by JVC Americas or were made by or for JVC Americas—after all, it is not clear how JVC Americas could be liable for an infringing product that was not made by it or for it and did not bear its brand name—which means that the accused products are "Products" within the meaning of the Agreement.

There is one issue that precludes summary judgment for JVC Americas on TLC's claims that JVC Americas violated the Reissue Patents, which as noted above are among the "Other Patents" referenced in the ¶ 2.3, the non-assertion covenant. Paragraph 2.3 states:

> [TLC] irrevocably and perpetually covenant[s] and agree[s] that [it] will not at any time assert or make any claim or commence or prosecute against Panasonic … any suit, action or proceeding of any kind based upon an assertion of infringement (direct, contributory or inducement) of Other Patents with respect to … Products [made or sold before December 15, 2006] …. This non-assertion covenant shall also extend to future Products

>and methods, of any form, type or kind imported, exported, made, used, sold, offered for sale, practiced, leased and/or otherwise disposed of by or for Panasonic anywhere in the world after December 15, 2006, provided that the portion of the future Product and/or method alleged to be covered by one or more claims of any of the patents subject to this non-assertion covenant is *substantially similar* to a Product, and/or portion thereof, and/or method, and/or portion thereof, that was previously imported, exported, made, used, sold, offered for sale, practiced, leased and/or otherwise disposed of by or for Panasonic anywhere in the world before December 15, 2006.

Doc. 42-1 at ¶ 2.3 (emphasis added). As this language makes clear, the non-assertion covenant does not apply to *all* products that could be made by "Panasonic" (a term that encompasses JVC Americas) after December 15, 2006; rather, it applies only to products "substantially similar" to products made or sold by "Panasonic" prior to that date

JVC Americas argues that the products that TLC accuses of infringing the Reissue Patents indisputably are "substantially similar" to products made or sold before December 15, 2006. Doc. 42 at 16-18; Doc. 62 at 13-15. But TLC has adduced contrary evidence on the point, raising a genuine dispute as to whether the accused products satisfy "substantially similar" test of ¶ 2.3. Doc. 57 at ¶¶ 51-53. It follows that JVC Americas has not demonstrated at this juncture, when all genuine factual disputes must be resolved in TLC's favor, that ¶ 2.3 protects JVC Americas from TLC's claims under the Reissue Patents. It follows that JVC Americas is not entitled to summary judgment on those claims. (No similar issue arises under ¶ 2.1, which provides a license to practice the VFS Patents.)

As JVC Americas notes, ¶ 2.5 of the Agreement provides that any dispute between the parties over whether a JVC Americas product is "substantially similar" to a pre-December 15, 2006 product within the meaning of ¶ 2.3 shall be resolved by an arbitrator:

>With regard to paragraph 2.3 above and before pursuing any other remedies, if the parties cannot agree at some future time whether or not a future Product or portion thereof and/or method is substantially similar to a

> Product, portion thereof, and/or method that was imported, exported, made, have made [*sic*], used, sold, offered for sale, practiced, leased, and/or otherwise disposed of by Panasonic on or before December 15, 2006, the issue will be submitted for final resolution to a patent attorney selected by the parties.

Doc. 42-1 at ¶ 2.5. In a footnote, JVC Americas argues that if summary judgment is not granted on TLC's claims under the Reissue Patents, the court "should stay or dismiss this Action as to the Reissue Patents in favor of" arbitration pursuant to ¶ 2.5. Doc. 42 at 18 n.2. The court will not stay or dismiss claims based on an argument presented in a footnote; if JVC Americas would like to arbitrate the "substantially similar" issue and TLC refuses, JVC Americas may file a motion to compel arbitration. If a such motion is filed, JVC Americas should remember that "the proper course of action when a party seeks to invoke an arbitration clause is to stay the proceedings rather than to dismiss outright," *Halim v. Great Gatsby's Auction Gallery, Inc.*, 516 F.3d 557, 561 (7th Cir. 2008) (internal quotation marks omitted), and that the authority to stay arbitration derives not from Federal Rule of Civil Procedure 12(b), but from § 3 of the Federal Arbitration Act, 9 U.S.C. § 3. *See Cont'l Cas. Co. v. Am. Nat'l Ins. Co.*, 417 F.3d 727, 732 n.7 (7th Cir. 2005); *Seremak v. Am. Exp., Inc.*, 2011 WL 3359915, at *3 (N.D. Ill. Aug. 3, 2011).

For the foregoing reasons, JVC Americas's motion for summary judgment is granted in part and denied in part. JVC Americas is granted summary judgment as to TLC's claims that JVC Americas infringed the VFS Patents, meaning U.S. Patent Nos. 6,141,057, 5,946,049, 5,550,594, and 6,469,741. Summary judgment is denied as to TLC's claims that JVC Americas infringed the Reissue Patents, meaning U.S. Patent Nos. RE 40,411 and RE 40,412.

January 18, 2013

                                              United States District Judge